AGREEMENT

BETWEEN

SEIU 1199 NEW JERSEY

AND

WANAQUE OPERATING CO., L.P.

December 26, 2002 - September 30, 2007

TABLE OF CONTENTS

PAGE

WITNESSETH .............................................................. 1
1. BARGAINING UNIT .................................................. 1
2. UNION SHOP ....................................................... 1
3. PROBATIONARY PERIOD .............................................. 1
4. NO DISCRIMINATION ................................................ 2
5. VISITATION ....................................................... 2
6. SENIORITY ........................................................ 2
7. NO STRIKE - NO LOCKOUT ........................................... 3
8. GRIEVANCE AND ARBITRATION PROCEDURE .............................. 3
9. WORKWEEK ......................................................... 5
10. WAGE INCREASES AND MINIMUM RATES ................................ 7
11. HOLIDAYS ........................................................ 7
12. VACATIONS ....................................................... 8
13. MISCELLANEOUS PROVISIONS ........................................ 10
    A. Sick Leave .................................................. 11
    B. Leave of Absense ............................................ 11
    C. Maternity Leave ............................................. 12
    D. Bereavement Leave ........................................... 13
    E. Leave for Jury Duty ......................................... 14
    F. Leave for Study ............................................. 14
    G. Malpractice Insurance ....................................... 14
    H. Polygraph Test .............................................. 14
    I. Breakage .................................................... 14
    J. No Past Practices or Maintenance of Benefits ................ 15
    K. Special Schedules ........................................... 15
    L. Bulletin Board .............................................. 15
    M. Health and Safety Committee ................................. 15
    N. Labor Management Meetings ................................... 15
14. UNIFORMS AND SHOE ALLOWANCE ..................................... 15
    A. Uniforms .................................................... 16
    B. Shoe Allowance .............................................. 16
15. MEDICAL EXAMINATIONS ............................................ 16
16. CHECK-OFF AUTHORIZATION ......................................... 16
17. SAVINGS CLAUSE .................................................. 17

18A.  GREATER NEW YORK WELFARE FUND, RETIREMENT PLAN, TRAINING AND
      UPGRADING FUND, AND PLANNING IN PLACEMENT FUND  . . . . . .  17
18B.  RETIREMENT PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
18C.  1115 PRE-PAID LEGAL SERVICES FUND . . . . . . . . . . . . . . . . . . . . . . . . . . 20
18D.  TRAINING AND UPGRADING FUND AND PLANNING IN
      PLACEMENT FUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
19.   PAYMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
20.   FUTURE REIMBURSEMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
21.   MANAGEMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
22.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
23.   TERMS OF EMPLOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
24.   DURATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      SCHEDULE A - NEW HIRE WAGE RATES (FOLLOWING
      PROBATIONARY PERIOD), WAGE INCREASES . . . . . . . . . . . . . . . . . . . 30

## A G R E E M E N T

AGREEMENT, made as of this 26th day of December, 2002, by and between SEIU 1199 NEW JERSEY, hereinafter referred to as the "UNION" and WANAQUE OPERATING CO., L.P. herein referred to as the "EMPLOYER"; located at 1433 Ringwood Avenue, Haskell, New Jersey 07420-1520.

## W I T N E S S E T H

WHEREAS, the Union has been designated by a majority of the employees of the Employer in the bargaining unit as their sole collective bargaining agent with respect to wages, hours and other conditions of employment; and

WHEREAS, it is recognized that the efficient and orderly method of establishing and maintaining peaceful and harmonious labor relations and of dealing with problems and controversies arising out of employment is through negotiations and agreement, rather than through strikes and lockouts;

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties agree as follows:

### 1. BARGAINING UNIT

The Employer recognizes the Union as the sole and exclusive bargaining agent for all full-time and regular part-time employees who work as nursing assistants, dietary employees, housekeeping employees and laundry employees, excluding all other employees, clerical employees, registered nurses, licensed practical nurses, technical and professional employees, cooks, supervisory cooks, instructors, central supply employees, ward clerks, physical therapy aides, maintenance employees, administrators, executive employees, confidential employees, guards and supervisors as defined in the Act.

### 2. UNION SHOP

A.    It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the execution or effective date of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the execution or effective date of this Agreement, whichever is later, shall on the thirtieth (30th) day following the execution or effective date of this Agreement, whichever is later, become and remain members in good standing in the Union.

It shall also be a condition of employment that all employees covered by this Agreement hired on or after its execution or effective date, whichever is later, shall on the thirtieth (30th) day following the beginning of such employment become and remain members in good standing in the Union.  The Employer shall promptly upon hiring new employees notify them of the existence of the Union shop provision of this Agreement.  In the event that the Union notifies the

Employer that an employee has not complied with the Union shop requirements, the Employer shall discharge said employee (and forthwith advise the Union thereof in writing) if the employee does not bring himself into compliance with the Union shop requirements immediately.

The Union agrees to indemnify and hold the Employer harmless against any and all charges, suits or claims for damages and penalties that shall arise out of or by reason of any action taken by the Employer for the purpose of complying with the provisions of this Union shop provision.

B.    Stewards and Committees elected or selected by the Union shall take up with the Employer, at reasonable times, problems that might arise at the place of employment, except those relating to discharge and lay-offs, which shall be discussed with the Union.

C.    The Employer shall forthwith give the Union a list containing the names and home addresses of employees covered by this Agreement, their categories, wages, social security numbers and dates of hire, and shall thereafter promptly furnish from time-to-time the names, social security numbers, home addresses, dates of hire, categories, and wages, of all new employees in the bargaining unit.

## 3. PROBATIONARY PERIOD

A.    New employees shall be deemed probationary during the first ninety (90) days of their employment during which time they may be discharged for any reason which need not be stated by the Employer, and shall not be subject to arbitration. Also upon written request by the Employer, the probationary period of ninety (90) days can be extended for another thirty (30) days.

## 4. NO DISCRIMINATION

The opportunity to give and obtain employment without discrimination because of race, creed, color, religion, age, sex, sexual orientation, marital status, national origin or non-job related disability is hereby recognized by the parties to this Agreement. The Employer shall not discriminate against any employee because of Union activities.

## 5. VISITATION

After first obtaining the Employer's permission, which permission shall not be unreasonably withheld, the Union Business Representative or the Union's designee shall have the right to visit the properties covered by this Agreement for the purpose of discharging his duties as representative of the Union, provided that such visitation does not interfere with resident care or the Employer's operation of the facility. The Employer shall make available to the Union a bulletin board for Union notices. With appropriate advance notice, the Union shall be permitted to conduct Union meetings on the Employer's premises, during the non-working hours of the attendees, provided the meeting does not interfere with resident care or the Employer's operation of the facility.

## 6. SENIORITY

A.      The Employer has the right to lay-off any employees, provided that layoffs may not be used as a subterfuge for discharge. Job-classification seniority shall prevail in the case of lay-off and rehiring of employees with stewards having top seniority. Two (2) weeks advance written notice shall be given to the affected employee and the Union of the lay-offs, except in circumstances beyond the Employer's control. Seniority shall be computed from the date of hire in the establishment or the date of hire with the Employer, whichever is longer. Seniority shall also accrue during paid leaves, military leaves, or during the period which the employee receives disability benefits or workmen's compensation.

B.      Promotions within the bargaining unit shall be upon the basis of ability and attendance record, with seniority to govern where the other factors are equal.

C.      Additional hours of work shall be offered to bargaining unit employees before being offered to employees of outside agencies. When additional hours are offered to employees, seniority shall govern, except that the Employer, at its option, may (i) offer hours first to employees who are not eligible for time and one-half, (ii) offer hours to employees in the classification who regularly work on the shift being offered, (iii) offer "emergency" hours to employees already at work before making calls to other employees, (iv) offer extra hours on a seniority basis by posting such hours availability one (1) week prior to the posting of the schedule and making awards seventy-two (72) hours after the postings, and (v) require (at periodic intervals) employees who desire additional hours to submit information concerning their availability (e.g., days and shifts), thereby minimizing the number of calls to be made by the Employer. While the Employer retains the right to modify the frequency with which it posts schedules and the timetable for such posting, the Employer's current practice is to post master schedules two weeks prior to the Sunday on which the master schedule commences.

Employees who consistently reject offers of available hours may be removed from the list of employees to be called after counseling with the employee regarding his/her desire and availability for these extra hours in the future.

## 7. NO STRIKE - NO LOCKOUT

A.      During the term of this Agreement, no employee shall engage in, and the Union shall not instigate, call or authorize, any strike, sympathy strike, sit-down, slow down, work stoppage, boycott, or other interference against the Employer (collectively referred to hereafter as "strike actions") at the establishment covered by this Agreement and the Employer shall not effect any lockouts. Should any employee or employees engage in any such strike actions and should the Employer notify the Union of such strike actions, a Representative of the Union shall, as promptly as possible, instruct such employees to forthwith cease such action and promptly return to their respective jobs and comply with the applicable provisions of this Agreement.

B.    The Employer agrees that in consideration of the performance by the Union as set forth above, with respect to any strike action which is contrary to the provisions of this section, there shall be no liability for damages on the part of the Union, by suit or otherwise, provided that the Union has not, directly or indirectly, instigated, called, or authorized any such strike action.

C.    The Employer agrees that, notwithstanding the duration and/or no strike provision in the collective bargaining agreement, the Union may engage in a strike against the Employer and other Seniors Management-North, Inc. affiliated nursing homes in New Jersey in which principals of Seniors Management-North, Inc. have an ownership interest (hereafter "Seniors Management-North affiliated nursing homes") as part of a concurrent strike against other New Jersey nursing homes in which the union has collective bargaining relationships if, and only if:

(i)    the union concurrently strikes at least 35% of the New Jersey homes with which it has a collective bargaining relationship; and

(ii)    the percentage of Seniors Management-North nursing homes which the union is striking is no greater than the ratio of all nursing homes being struck (excluding Seniors Management-North affiliated nursing homes) compared to the total number (excluding Seniors Management-North affiliated nursing homes) with which the union has not reached an agreement. Facilities will be counted in whole numbers.

> **Example #7(C)(2)-1:** Assume the following: The union has collective bargaining relationships with 75 nursing homes, including 4 contracts with Seniors Management-North, Inc. affiliated nursing homes. All of the Seniors Management-North, Inc. affiliated nursing homes are subject to the concurrent state wide strike and none has reached an agreement. The union has reached agreement with 15 other nursing homes, leaving 60 not settled. The union strikes 29 of the 60 nursing homes – 39% of its total complement and 48% of its complement subject to the state wide strike. Of these 29 nursing homes, one may be a Seniors Management-North, Inc. affiliated nursing home (since 48% of Seniors Management-North's 4 nursing homes is less than two).

> **Example #7(C)(2)-2:** Same facts as Example #1, above, except this time the union strikes 20 nursing homes – 27% of its total complement. It would not be permitted to strike and Seniors Management-North, Inc. nursing homes.

(3)    with respect to picketing unaccompanied by a strike against The Wanaque Center, such picketing does not result in employees failing or refusing to report for work as scheduled or in other interference with The Wanaque Center's operations.

The Union will provide the Employer thirty (30) days advance written notice of a concurrent statewide action. Upon such notification, the Employer may make a written request for a current list with names and addresses of nursing homes organized by the union specifying which nursing homes are subject to statewide strike. The list shall be produced within ten (10) days of request. Failure to provide this list on a timely basis will void the Union's right to include the Employer in a concurrent statewide action.

In the event of a strike or picketing against The Wanaque Center, the Union will provide to the Employer, when it delivers its Section 8(g) notice, a list of the New Jersey nursing homes which have been issued Section 8(g) notices in connection with the strike or picketing and a list of the nursing homes which have entered into multi-year agreements as described above.

If as a result of the Union's political activity, the Medicaid reimbursement system is modified such that additional Medicaid funds become available above the amount which would have otherwise been available, then the parties agree to enter into discussions in an effort to mutually agree upon terms and conditions of employment to be effective upon the effective date of such increased funding.

## 8. GRIEVANCE AND ARBITRATION PROCEDURE

A.   A grievance shall be defined as a dispute or complaint arising between the parties hereto under or out of this Agreement or the interpretation, application, performance, termination, or any alleged breach thereof, and shall be processed and disposed of in the following manner:

Step 1.   Within five (5) working days, grievances shall be reduced to writing, signed by the grievant and his Union representative, and presented to the grievant's department head or his designee. A grievance so presented shall be answered by the Nursing Facility in writing within five (5) working days after its presentation.

Step 2.   If the grievance is not settled in Step 1, the grievance may, within five (5) working days after the answer in Step 1, be presented in Step 2. A grievance shall be presented in this step to the Administrator of the Nursing Facility or his designee; and he or his designee shall render a decision in writing within five (5) working days after the presentation of the grievance in this step.

Failure on the part of the Nursing Facility to answer a grievance at any step shall not be deemed acquiescence thereto, and the Union may proceed to the next step.

B.   Anything to the contrary herein notwithstanding, a grievance concerning a discharge or suspension may be presented initially at Step 2 in the first instance, within the time limit specified in Step 1 of this Article.

C.    Without waiving its statutory rights, a grievance on behalf of the Nursing Facility may be presented initially at Step 2 by notice in writing addressed to the Union at its offices.

D.    All time limits herein specified shall be deemed to be exclusive of Saturdays, Sundays and holidays.

E.    Any disposition of a grievance from which no appeal is taken within the time limits specified herein shall be deemed resolved and shall not thereafter be considered subject to the grievance and arbitration provisions of this Agreement.

F.    A grievance which affects a substantial number or class of employees, and which the Nursing Facility representative designated in Step 1 lacks authority to settle, may initially be presented at Step 2 by the Union representative.

## ARBITRATION

G.    A grievance, as defined above, which has not been resolved thereunder may, within ten (10) working days after completion of Step 2 of the grievance procedure, be referred for arbitration by the Nursing Facility or the Union to an arbitrator selected in accordance with the procedures of the Federal Mediation and Conciliation Service ("FMCS"). The arbitration shall be conducted under the FMCS' rules. (By mutual agreement, the parties may agree upon a mutually acceptable arbitrator without utilizing FMCS.)

H.    The fees and expenses of the FMCS (if any) and the Arbitrator shall be borne equally by the parties.

I.    The award of an arbitrator hereunder shall be final, conclusive and binding upon the Nursing Facility, the Union and the Employees.

J.    The Arbitrator shall have jurisdiction only over disputes arising out of grievances, as defined in this Article, and he or she shall have no power to add to, subtract from, or modify in any way any of the terms of this Agreement. Notwithstanding the foregoing, the Arbitrator shall have no jurisdiction over grievances based upon actions which occur after the expiration of this Agreement.

K.    The maintenance of a peaceful and constructive relationship and industrial stability between the Union, the Employer and their employees, requires the use of the grievance and arbitration machinery for the settlement of all complaints, disputes and grievances, and it would detract from this relationship if individual employees or groups of employees would either as such individuals or groups seek to interpret or enforce this Agreement on their own initiative or responsibility. No individual employee or group of employees may initiate any arbitration proceeding. All of the rights and privileges created by or implied from this Agreement shall be enforceable only by the Union and the Employer.

6–

## 9. WORKWEEK

A.    Nothing in this Agreement shall be construed as guarantee of hours to be worked per day, per week, or per year. The regular workweek shall be thirty-seven and one half (37-1/2) hours consisting of five (5) days in any week. The work days shall consist of seven and one-half (7-1/2) consecutive hours each day, excluding an unpaid thirty (30) minute meal period. All hours worked in excess of seven and one-half (7-1/2) hours in any day or thirty-seven and one-half (37-1/2) hours in any workweek shall be paid for at the rate of time and one-half (1-1/2) the regular hourly rate of pay.  Additional hours of work, when available, shall be offered in accordance with Article 6(C) above; however, employees shall be required to work overtime when necessary, in emergency situations, for the proper staffing and administration of the facility, in reverse seniority among employees in the classification who are in the facility when the Employer becomes aware of the emergency and, if necessary, in reverse seniority thereafter among the remaining employees in the classification.

B.    Housekeeping: Notwithstanding the provisions of Article 9(A), the regular work week for housekeeping employees shall be the number of hours for which the employee was hired, subject to the layoff provision of Article 9(A). In all other respects, Article 9(A) shall be applicable to housekeeping employees, with hours worked in excess of seven and one-half (7-1/2) hour work day and thirty-seven and one-half (37-1/2) hours in any work week being paid for at the rate of time and one-half (1-1/2) the regular hourly rate of pay.  Similarly, "full-time" as used in the collective bargaining agreement refers only to employees who regularly commit to working thirty-seven and one-half (37-1/2) hours per work week.

C.    There shall be no pyramiding of overtime.

D.    Part-time employees shall be paid the regular minimum rate and shall receive paid time off benefits (vacation, sick days and holidays) on a pro-rata basis. An employee's pro-rated share shall be calculated as follows: normal number of hours which employee committed to work per week (excluding additional hours which ultimately may have been worked) divided by thirty-seven and one-half (37-1/2) hours.

E.    No employees will be transferred to a shift other than that for which said employee was hired, except by mutual consent. There shall be no change in the starting and stopping times of a shift, except on at least one (1) week's prior written notice to the Union.

F.    Each employee shall receive two (2) fifteen (15) minute breaks per shift (one break for shifts of less than seven and one-half hours).

## 10. WAGE INCREASES AND MINIMUM RATES

A.    Certain new hire rates and increases are set forth in Schedule "A", and made a part hereof. The Employer retains the unilateral right to increase the new hire rates, after consultation with the Union, provided that no employees are paid below those rates (i.e., any employees being paid below the new hire rate shall be raised to that rate).

7–

B.      Nothing herein contained shall prevent the Employer, in its absolute discretion, from giving merit increases, bonuses, or other similar payments, the implementation of which shall not affect the new hire wage rates set forth herein.

C.      Employees performing work of a higher classification should receive the rate for the higher classification, except when filling in on an emergency basis (up to a maximum of three (3) working days).

D.      Wages are to be paid by check each and every two (2) weeks and accompanying all pay shall be an itemized list of deductions.

E.      New Units: Upon advance notification to the Union, the Employer may, at its discretion, establish probation rates and post-probation minimums for skilled nursing specialty units that may be created. The Union may request discussion provided that such discussion occurs within three (3) business days of receipt of notice by the Union.

Current employees would have the right to bid into bargaining unit positions and maintain their rate, benefits and seniority.

During the first 90 days in the new position, the employee may elect to return to his/her former position upon the first available opening in said position by providing written notice of his/her election. During the first 90 days in the new position, the Employer may, at its discretion, provide written notice of its intent to return the employee to his/her former position upon the first available opening in said position. In either case, the employee will be restored to his/her previous rate, benefits and seniority. The restoration of an employee to his/her former position may occur after the first 90 days in the new position if an opening has not occurred in his/her former position. The Employer's decision shall not be subject to the grievance and arbitration procedure pursuant to Article 8 of this Agreement.

F.      New Shifts: The Employer may in its discretion develop shift options and establish associated rates of pay, which shall be awarded pursuant to the posting process. Employees on newly established shift options shall not displace current employees from their current regular shifts.

## 11. HOLIDAYS

A.      All employees shall, after their first ninety (90) days of employment and subject to the conditions stated below, receive the following holidays with pay:

> New Year's Day
> Spring Holiday
> Memorial Day
> Independence Day
> Labor Day
> Thanksgiving Day

8–

Christmas Day
Two (2) Personal Days

Holiday pay shall be seven and one-half (7 ½) hours pay for full-time employees at the employee's regular rate. Part-time employees shall receive holiday pay on a pro-rata basis, based upon the average number of hours which the employee committed to work per week (excluding additional hours which ultimately may have been worked) during the two (2) full calendar months immediately preceding the holiday.

B.    Should it be necessary for an employee to work on any of the holidays to which he is entitled, he shall receive his regular straight time pay in addition to another day's pay (subject to (F) below), except as follows: an employee who works on a "premium holiday," defined below, shall be paid time and one-half (1-1/2) for all hours worked on the holiday, in addition to the holiday pay. Christmas Day, New Year's Day and Independence Day shall be premium holidays.

Though the Employer has the right, at its sole discretion, to require any employee to work on a holiday, it shall distribute holidays off on an equitable basis.

C.    Employees shall be notified by the Employer five (5) days in advance in the event the said Employer requires such employee or employees to work on the holiday.

D.    If any one of the holidays occurs during an employee's vacation period, the holiday will not be treated as a vacation day.

E.    In order to qualify for holiday pay, an employee must work his last scheduled work day before and his first scheduled work day after the holiday, or have a reasonable documented excuse for absence on the day before or after the holiday. In no case shall an employee who has not worked at least one (1) day within the pay period including the holiday receive holiday pay, unless on vacation or a recognized paid leave of absence.

F.    In lieu of another day's pay when working the holiday, the employee may request another day off.

G.    An employee who fails to report for work on the holiday when instructed to report shall not receive holiday pay for the unworked holiday.

H.    As noted above, non-probationary employees shall be eligible for two (2) personal days per year, measured on the basis of the employee's anniversary year of employment. The use of a personal day must be requested at least ten (10) days in advance of the day requested. Such requests will not be unreasonably refused. The Employer is not required to grant such requests for personal days if it will result in a time and one-half situation for the substitute.

9—

I.          Employees may use the Spring Holiday or a personal day on Martin Luther King, Jr.'s Birthday upon proper notice as determined by the Employer.

J.          Birthday: Employees with 5 years seniority will receive the day off with pay pursuant to Article 11(A) on their birthday unless it falls on a holiday or scheduled weekend, in which case employees will: (1) be paid for the birthday in lieu of receiving another day off or (2) schedule a day off during the same payroll period as when the birthday falls by notifying the Employer no fewer than seven (7) days prior to the posting of the schedule.

## 12. VACATIONS

A.          Vacations with full pay at the employee's prevailing rate of pay at the time of vacation shall be granted for full length of service in the establishment, and not merely based on length of ownership of the establishment by the Employer as follows:

| PERIOD OF EMPLOYMENT | AMOUNT |
|---|---|
| After One (1) Year | Two (2) Weeks[1] |
| After Five (5) Years | Three (3) Weeks |
| After Ten (10) Years | Twenty (20) Days |

B.          Vacation assignment shall be made by the Employer (in consultation with the Union, upon the Union's request, following the vacation assignment in an effort to address legitimate employee concerns) to ensure the orderly and  efficient continuation of operations, but the Employer agrees to give, whenever possible, the desired vacation time on a consecutive basis indicated by the employee in order of bargaining unit seniority, among employees in the job classification in the same scheduling unit, consistent with the Employer's vacation selection procedures then in effect. If any employee's employment terminates for any reason whatsoever after six (6) months or more of substantial employment within the vacation accrual year, he shall receive pro-rated vacation pay. Breaks in service not exceeding two (2) months as a result of illness or injury shall not affect an employee's eligibility for vacation benefits.

C.          Part-time employees shall receive paid vacation on a pro-rata basis, based upon the average number of hours which the employee committed to work per week (excluding additional hours which ultimately may have been worked) during the prior anniversary year.

---

[1]  One (1) of the two (2) weeks for which an employee will become eligible after one (1) year of employment may be taken after six (6) months of employment, thereby leaving the employee with the remainder of the two weeks to be taken between his first and second employment anniversary dates.

10—

D.    Employees may receive vacation pay in advance of vacation upon thirty (30) calendar days' written notice.

## 13. MISCELLANEOUS PROVISIONS

A.    Sick Leave

1.    Sick leave pay may be used for absences of an employee from his/her regularly scheduled work due to illness or injury which is not compensable under the Workers' Compensation law.

2.    (a)    Each full-time employee shall receive a maximum of six (6) days of paid sick leave each calendar year, which shall accrue at the rate of one-half (½) day for each month of employment following the probationary period up to a maximum of thirty (30) days. Employees may use sick days earned in 1994 and thereafter during the first day of absence.

(b)    Each full-time employee with one year's seniority shall accrue paid sick leave at the rate of two-thirds (2/3) day for each month of full time employment following the probationary period up to a maximum of thirty (30) days, inclusive of Article 13(A)(2)(a), above.

3.    (a) Accumulated sick days earned through December, 1994 may not be sold back, but may be carried over and used on third day out.

(b) Employees may choose to sell back unused sick pay, earned during the previous calendar year only, at the rate of one hundred percent (100%) of the employee's rate of pay as of the last day of the previous calendar year, except that employees accruing sick time pursuant to Article 13(A)(2)(b), above, must bank two (2) sick days per year in order to sell back unused sick pay. Unused sick days beyond the two (2) banked days per year may be sold back or banked at the employee's option.

(c) Each employee shall notify the Employer by January 2 of each year of his/her desire to sell back such sick leave; employees who elect to do so shall receive payment in their paychecks covering the first full payroll in January.

(d) "LIFO" (last in, first out) shall apply with respect to the use of sick leave. Thus, for example, sick leave earned in the current calendar year shall be used before sick leave earned in the immediately preceding calendar year, and so on for sick leave earned in prior calendar years.

(e) The waiting period in effect when any carried over sick leave was earned shall continue to be applicable in connection with its use in subsequent years:

11—

Example: An employee has carried over three (3) 1993 unused sick days (with a waiting period of two (2) days) into 1995. If the employee uses no sick days in January or February, 1995, the employee would have the following sick days available beginning in March, 1995:

Pre-1995 Days: 3 (2 day waiting period)

1995 Days: 1 (no waiting period)

If the employee is sick for five (5) consecutive days beginning March 2, 1995, the employee would receive pay for the first day of absence (using the 1995 sick day), would not be paid for the second day of absence (since there is a two (2) day waiting period for the pre-1995 sick days), and would be paid for the third, fourth and fifth days (using the pre-1995 sick days).

4.      Sick leave shall be paid for as and when used, provided proper notice is given by the employee to the Employer in accordance with the Employer's call-out policy which may be modified from time to time.

5.      No sick leave (regardless of when earned) is paid upon an employee's termination of employment.

6.      Any absence due to illness of three (3) or more consecutive work days shall be supported by a doctor's note, as shall absences of shorter duration where there is evidence of prior abuse and the employee previously was notified of this requirement.

7.      Part-time employees shall accrue sick leave on a pro-rata basis, based upon the number of hours which the employee committed to work (excluding additional hours ultimately may be worked) during the calendar month. (Sick leave for part-time employees shall be calculated in hours rather than days.)

B.      Leave of Absence

1.      Any employee becoming ill or otherwise medically disabled (subject to the Employer's right to require medical certification of such illness or disability) shall be entitled to an unpaid leave of absence for up to six (6) months during any twelve (12) month period, and said employee shall be entitled to reinstatement upon recovery without loss of seniority, subject to the Employer's right to require medical certification that the employee is fully capable of returning to work and does not pose health risks to residents or other employees.

12--

2. In the event an employee is drafted or enlists in the armed services, said employee shall be granted a military leave of absence in accordance with applicable law.

3. In the interest of maintaining stability of labor relations and realizing that the handling of grievances by stewards is an important step in the initial processing of grievances so as to encourage stability of labor relations, the parties agree that it is advisable from time to time to have the steward take a course of instruction. Accordingly during each contract year, no more than five (5) stewards shall be granted two (2) days off without pay for the purpose of attending conferences or steward training programs, provided the Union gives notice to the Employer at least one (1) week prior to the posting of the work schedule (except that in no event shall more than five (5) weeks notice be required).

4. An unpaid leave of absence not to exceed one (1) year shall be granted to one employee (at any time) who has one (1) or more years of bargaining unit seniority in order to accept a full-time position with the Union. The Union shall provide at least thirty (30) days notice prior to the requested commencement date for this leave.

5. While on an unpaid leave of absence, an employee shall not be entitled to earn holiday pay nor to accrue sick leave time, vacation days, or seniority, except as otherwise expressly provided. Contributions set forth in Paragraphs 18A, 18B, 18C and 18D shall be continued to be paid during the period of all medical disability leaves provided in this Agreement, not to exceed two (2) months, except that contributions into the 1115 Medical Plan will be continued during a leave of absence covered by the Family and Medical Leave Act for twelve (12) weeks.

6. The Employer shall comply with the federal Family and Medical Leave Act (FMLA) and the New Jersey Family Leave Act (NJFLA) in accordance with their terms. Leaves of absence required by these statutes run concurrently with other leaves of absence authorized under this collective bargaining agreement, to the extent permitted by these statutes. No leaves of absence may be stacked upon another leave of absence unless otherwise required by statute.

Employees are required to use their accumulated but unused sick days, vacation and personal days during the course of their FMLA and NJFLA leaves, including leaves taken on an intermittent or reduced leave basis, except that this requirement shall not apply until an employee has been absent on an FMLA or NJFLA leave for four (4) weeks during a rolling twelve (12) month period.

C. Maternity Leave

Unpaid leaves of absence shall be granted for pregnancy in accordance with the rules stated above for other medical disabilities.

D.    Bereavement Leave

1.    In case of a death in the immediate family, non-probationary full-time employees shall be entitled to up to three (3) days of paid leave. Immediate family includes spouse, child, parents, brother or sister.

In case of a death of a member of the immediate family who lives out of town and additional time off is necessary, the Employer will grant reasonable additional time off without pay for the purpose of attending the funeral. Verification of death if requested by the Employer shall be furnished by the employee.

2.    Part-time employees shall be granted bereavement leave in accordance with their specific schedule (no pay if not scheduled).

E.    Leave for Jury Duty

1.    Non-probationary full-time employees who are called for Jury Duty shall be paid the difference between their regular rate for regular scheduled time lost and the amount they receive as Jury pay, provided they offer valid proof of such jury duty and the amount received as jury pay. Whenever the employee is temporarily excused from such jury duty by the Court on his scheduled work day, he shall advise his Supervisor as promptly as possible and stand ready to report for work if requested. The receipt of a subpoena or notice to report for jury duty must be reported immediately to the Department Head.

2.    Part-time employees shall be granted paid leave for jury duty in accordance with their specific schedule (no pay if not scheduled).

F.    Leave for Study

An employee who wishes to undertake the schooling to qualify for a higher classification of work shall be granted a leave of absence for not more than two (2) years to complete such schooling, and upon proof of satisfactory completion thereof, the Employer shall grant such employee preferential hiring rights in the classification in which such employee is then qualified.

G.    Malpractice Insurance

Malpractice insurance coverage to be provided by the Employer at its own cost, as heretofore.

H.    Polygraph Test

The Employer shall require and/or use polygraph tests only in accordance with state and federal law.

I.    Breakage

The Employer shall not deduct any monies from any employee for breakage except if malicious, intentional, grossly negligent or required by law.

J.    No Past Practices or Maintenance of Benefits

The Employer retains the right to continue or to discontinue past-practices or other benefits (such as special arrangements or bonuses) except as negotiated.

K.    Special Schedules

The Employer retains the right to continue (with compensation incentives), or to discontinue, at its sole discretion, the special schedules that it utilizes presently (e.g., Twin-12's).

L.    Bulletin Board

The Employer shall provide one (1) locked enclosed bulletin board for the exclusive use of the Union. Such bulletin board shall be located in a place readily accessible to Employees in the course of their employment.

M.    Health and Safety Committee

The Union may select two (2) employees to serve on the Employer's Health and Safety Committee. Meetings shall be held on a quarterly basis, upon request of either the Union or the Employer.

N.    Labor Management Meetings

(a)    The Union and Employer agree to the establishment of a Labor-Management Committee, composed of up to three (3) representatives selected by the Union and up to three (3) representatives selected by the Employer.

(b)    Meetings shall be held on a quarterly basis, upon the request of either the Union or the Employer. Agendas shall be exchanged one (1) week in advance of a meeting. Employee representatives may attend these meetings, without loss of pay, if these meetings are scheduled when such employees otherwise are scheduled to work, provided that this provision shall not prevent the Employer from scheduling such meetings at other times.

## 14. UNIFORMS AND SHOE ALLOWANCE

A.    Uniforms: The Employer agrees to furnish the following uniform tops, where required:

1.    One (1) uniform top and pants at hire.

2.    One (1) uniform top and pants after successful completion of probation. (No additional top or pants after six (6) months of employment.)

3.    One (1) uniform top and pants on the employee's first anniversary date, and each half anniversary date and anniversary date thereafter.

B.    Shoe Allowance: The Employer shall pay a shoe allowance of thirty dollars (\$30.00) in April, 2003 to full-time non-probationary employees (employees who are assigned to work and who commit to working thirty seven and one-half (37-1/2) hours per week) who have completed at least one (1) year of service on that date. [Exception: Non-probationary housekeeping employees who meet the foregoing requirements, but who are regularly scheduled to work thirty (30) or more hours per week shall be eligible for this shoe allowance.] Otherwise eligible employees who have not qualified for the shoe allowance on April 1, 2003 shall receive the shoe allowance thereafter upon completing one (1) year of service. No employee shall receive more than one (1) shoe allowance during the term of the Agreement.

## 15. MEDICAL EXAMINATIONS

Employees may be required to take medical examinations by the Employer's designated physician at times and dates specified by the Employer. The Employer shall give reasonable advance notice to the employees of such examinations. All medical examinations required by the Employer shall be paid by the Employer except that if an employee fails or refuses to take a medical examination at the time and date specified by the Employer, after receiving reasonable advance notice of such examination, the Employer shall be relieved of his obligation to pay for such examination and the payments therefore shall be payable by the employee.

## 16. CHECK-OFF AUTHORIZATION

The Employer agrees to deduct no later than the first payroll date of each month from the wages of employees, their membership dues, initiation fees, and COPE (Committee on Political Education) and shall at the same time remit said monies to the Union together with a list of the names of employees from whom such deductions have been made and the amounts thereof; provided that the Employer had previously received from each employee on whose account such deductions are made a written assignment which shall not be irrevocable for a period of more than one (1) year, or beyond the termination date of this Agreement, whichever

16—

occurs sooner, unless otherwise required by law. The Union will notify the Employer in writing of the exact amount of such monies to be deducted. All funds deducted by the Employer shall be held as trust funds and shall not be commingled with other funds of the Employer.

The Union agrees to indemnify and hold the Employer harmless against any and all charges, suits or claims for damages and penalties that shall arise out of or by reason of any action taken by the Employer for the purpose of complying with the provisions of this Article. Once the Employer has remitted the funds to the Union, the disposition of the funds shall be the exclusive responsibility and obligation of the Union.

17. SAVINGS CLAUSE

In the event that any portion of this Agreement is invalidated by the passage of legislation or a final decision of a court or government agency having jurisdiction, such invalidation shall apply only to that portion thus invalidated and all remaining portions of this Agreement not invalidated shall remain in full force and effect. Any substitution for the invalidated portion which is mutually agreed upon between the parties shall be reduced to writing and shall thereupon become a part of this Agreement.

18. GREATER NEW YORK WELFARE FUND, RETIREMENT PLAN, TRAINING AND UPGRADING FUND, AND PLANNING IN PLACEMENT FUND

18A. GREATER NEW YORK WELFARE FUND

1.    Contributions.    The Employer shall make monthly contributions for coverage for eligible employees into the Greater New York Welfare Fund ("Fund") as follows:

| Effective Date for Coverage | Employer Contribution |
|---|---|
| 12/1/02* | 12%/month of Gross Payroll |
| 03/01/04* | 16% of Gross Payroll |
| 03/01/05* | Prevailing rate set by Trustees of the Fund for New Jersey nursing homes, but not in excess of 20% of Gross Payroll |
| 03/01/06* | Prevailing rate set by Trustees of the Fund For New Jersey nursing homes |
| 03/01/07* | Prevailing rate set by Trustees of the Fund for New Jersey nursing homes |

*    All contributions will be calculated based on payroll paid on the first pay day occurring on or after the specified date.

2.    Eligibility.    The Employer's obligation to make contributions for employees who satisfy the Fund's eligibility requirements will begin after an employee has performed work or received wages on a regular basis for 90 calendar days, in which event the

17—

Employer will make contributions on the employee's behalf for work performed or wages paid back to the employee's 61st calendar day of employment.

- Example 18(2)-1: John Doe completes 60 calendar days of employment at the time contributions are due. His gross pay is not included in the calculation of gross payroll subject to Fund contributions. However, when he completes 90 calendar days of employment, his gross pay from the 61st calendar day of his employment to the last day upon which contributions are based is included in the calculation of gross payroll subject to Fund contributions.

- Example 18(2)-2: John Doe is discharged after 75 calendar days of employment. His gross pay is not included in the calculation of gross payroll subject to Fund contributions.

3.    Payment of Contributions.    Contributions will be made to the Fund by the twentieth (20th) of the month immediately following the month to which the contribution applies (e.g., contributions paid in January, 2003 will be calculated based on Gross Payroll on pay days in December, 2002). As a result of the foregoing, the Employer will not make a contribution to the Fund or any other welfare fund in December, 2002.

4.    In the event of any inconsistencies or ambiguities between the terms and conditions of the collective bargaining agreement (and side letters to the collective bargaining agreement) and the Fund's plan documents, the collective bargaining agreement (and accompanying side letters) shall govern.

5.    The Fund shall provide benefits as shall from time to time be decided upon by the Trustees of the Fund, provided that the Employer's contribution toward this insurance shall not exceed the amounts set forth above.

6.    Together with the contributions agreed upon by the Employer, there shall be remitted to the Fund statements showing the name of each employee for whom contributions are made.

7.    The Union represents that the Fund is established in accordance with applicable laws.

8.    After reasonable notice (of not less than seven (7) calendar days) has been given, the Union and any authorized agents or representatives of the Fund shall have the right, at a time mutually agreed upon by the Employer, to examine, audit and copy (at the Fund's expense) such of the books and records of the Employer necessary to permit the Union and Fund to determine whether the Employer is making full payments of the amounts required by the Agreement. Such audit shall take place at the location designated by the Employer where the books and records relevant to the audit normally are maintained.

9.    If circumstances warrant, an arbitrator may award interest on the Employer's delinquent contributions, provided that arbitration shall not be requested unless the Employer is at least thirty (30) days late in mailing in a single contribution or the Employer's contributions are mailed late by ten (10) days or more for three (3) consecutive months.

10.    Except for making agreed upon contributions (and possible interest payments limited to those referred to above), the Employer assumes no obligation, financial or otherwise, to any person or entity arising out of this Article 18(A), and the Union hereby agrees to indemnify and hold the Employer harmless for any claims, actions or proceedings by any employee arising from or relating to the Fund.

18B. RETIREMENT PLAN

1.    The Employer will maintain a 401(k) Plan, paying the basic installation expense for establishing the Plan and the yearly maintenance expense for maintaining it. The Employer's obligation under this Section is limited to that permitted by applicable laws.

2.    Eligibility. Employees must work 1,000 hours in their first full year of employment. Employees are responsible for any per participant service fee.

3.    Employer Contributions. Effective January 1, 2003, the Employer, on behalf of each eligible employee, will contribute $7.50 per compensable week, for a maximum of $390 per calendar year, in one annual payment. The Employer will make contributions into the Plan only for Employees who are employed as of December 31st each year.

4.    Employee Contributions. Eligible employees may make voluntary contributions to the Plan up to the maximum amount permitted by law. Employee contributions will be deducted on a payroll basis and remitted to the Plan no less frequently then monthly.

5.    Vesting Schedule.

(a)    The Plan will implement the following six (6) year vesting schedule with respect to the Employer's contributions:

| Plan Year (January 1st to December 31st) | Vesting |
| --- | --- |
| 2d | 20% |
| 3rd | 40% |
| 4th | 60% |
| 5th | 80% |
| 6th | 100% |

(b)    Employees must work 1,000 hours in a Plan year in order for Employer contributions to vest pursuant to the vesting schedule set

19—

forth above. (e.g., An employee hired on August 1, 2003 who has worked 800 hours as of December 31, 2003 would not have any vesting service for 2003.)

(c)    For purposes of this vesting schedule, Employees will be credited with their Facility Seniority, except that Employees who were fully vested under the Local 1115 Pension Plan as of January 1, 2003 will remain vested at 100% for future Employer contributions. Employee contributions are vested immediately without regard to the foregoing vesting schedule.

(d)    Employer contributions that are forfeited by Employees due to termination of employment for any reason will be used for future Employer contributions to eligible employees as described above.

## 18C. 1115 PRE-PAID LEGAL SERVICES FUND

1.    (a) The Employer shall pay to the 1115 Prepaid Legal Service Care Fund ("Legal Services Fund") the sum of eight dollars ($8.00) per month for each non-probationary employee who has committed to working (and, in fact, performs work or receives wages) on a regular basis in excess of twenty-four (24) hours per week.

(b) Effective 7/1/04, and any time thereafter, upon advance notification to the Employer, the Employer's monthly contribution per eligible employee into the 1115 Legal Services Fund may be increased up to $15 per month if the Trustees of the Fund determine that such an increase is needed to maintain a three month reserve in the Fund.

2.    The parties to this Agreement hereby designate, adopt and approve a closed panel of lawyers as the method of providing for such Prepaid Legal Service Benefit for covered employees, their spouses and dependents as shall from time to time be decided upon by their Trustees of the Legal Service Fund.

3.    Together with such payments, there shall be remitted to the Legal Service Fund statements showing the name of each employee for whom contributions are made.

4.    The Union represents that the Legal Service Fund is established in accordance with applicable laws.

5.    After reasonable notice (of not less than seven (7) calendar days) has been given, the Union and any authorized agents or representatives of the Legal Service Fund shall have the right, at a time mutually agreed upon by the Employer to examine, audit and copy (at the Fund's expense) such of the books and records of the Employer to permit the Union and Fund to determine whether the Employer is making full payments of the amounts required by the Agreement. Such audit shall take place at the location designated by the Employer where the books and records relevant to the audit normally are maintained.

6.    If circumstances warrant, an arbitrator may award interest on the Employer's delinquent contributions, provided that arbitration shall not be requested unless the Employer is at least thirty (30) days late in mailing in a single contribution or the Employer's contributions are mailed late by ten (10) days or more for three (3) consecutive months.

7.    Except for making contributions provided for above (and possible interest payments limited to those referred to above), the Employer assumes no obligation, financial or otherwise, to any person or entity arising out of this Article 18C, and the Union hereby agrees to indemnify and hold the Employer harmless for any claims, actions or proceedings by any employee, arising from or relating to the Legal Service Fund.

## 18D.    TRAINING AND UPGRADING FUND AND PLANNING IN PLACEMENT FUND

1.    Eligibility: The Employer's obligation to make contributions for employees who satisfy the Funds' eligibility requirements will begin after an employee has performed work or received wages on a regular basis for 90 calendar days, in which event the Eployer will make contributions on the employee's behalf for work performed or wages paid back to the employee's 61st calendar day of employment.

2.    Effective the first full month following ratification, the Employer will contribute 1/2% of gross payroll to the 1199 Training and Upgrading Fund and 1/4% of gross payroll to the Planning in Placement Fund.

> *    All contributions will be calculated based on payroll paid on the first pay day occurring on or after the specified date.

3.    In the event of any inconsistencies or ambiguities between the terms and conditions of the collective bargaining agreement (and applicable side letters) and the Plan Documents, the collective bargaining shall govern.

4.    The Funds shall provide benefits as shall from time to time be decided upon by the Trustees of the Funds, provided that the Employer's contribution shall not exceed the amounts set forth above.

6.    Together with the contributions agreed upon by the Employer, there shall be remitted to the Funds statements showing the name of each employee for whom contributions are made.

7.    The Union represents that the Funds are established in accordance with applicable laws.

8.    After reasonable notice (of not less than seven (7) calendar days) has been given, the Union and any authorized agents or representatives of the Funds shall have the right, at a time mutually agreed upon by the Employer, to examine, audit and copy (at the Funds' expense) such of the books and records of the Employer necessary to permit the Union and Funds

21–

to determine whether the Employer is making full payments of the amounts required by the Agreement. Such audit shall take place at the location designated by the Employer where the books and records relevant to the audit normally are maintained.

9.    If circumstances warrant, an arbitrator may award interest on the Employer's delinquent contributions, provided that arbitration shall not be requested unless the Employer is at least thirty (30) days late in mailing in a single contribution or the Employer's contributions are mailed late by ten (10) days or more for three (3) consecutive months.

10.    Except for making agreed upon contributions (and possible interest payments limited to those referred to above), the Employer assumes no obligation, financial or otherwise, to any person or entity arising out of this Article 18C, and the Union hereby agrees to indemnify and hold the Employer harmless for any claims, actions or proceedings by any employee arising from or relating to the Funds.

### 19. PAYMENTS

Monies required to be checked off under Article 16 and all payments required to be made to the 1115 Pre-Paid Legal Services Fund under Article 18C are to be mailed by the Employer by the twentieth (20th) of the month to which they relate. Monies required to be made to the Greater New York Welfare Fund under Article 18A and the Training and Upgrading Fund and the Planning in Placement Fund under Article 18D will be mailed by the Employer by the twentieth (20th) of the month immediately following the month to which the contributions apply.

### 20. FUTURE REIMBURSEMENTS

(A)    Overview. It is recognized that the existing Medicaid Reimbursement System ("System") (which currently results in a Medicaid per diem rate), as adjusted annually by inflation, will be insufficient to pay for the increased cost of funding the contributions by the Employer required by the Greater New York Welfare ("Fund"). Nevertheless, the Employer has agreed to participate in the Fund in anticipation that there will be modifications to the System which will result in a greater increase in payments to the facility than under the present system. The parties agree that the Employer shall have the right, in its discretion, to withdraw from the Fund any time on or after 7/1/05, at annual intervals as described below in paragraph 20(D)(1), in the event that the System, as modified, generates insufficient revenues to pay for additional Employer contributions required by the Fund for bargaining unit employees.

(B)    Calculation of Additional Cost: To determine how much additional money is required for the Employer to continue bargaining unit employees in the Fund, the cost to the Employer of the Fund for bargaining unit employees will be compared to the cost to the Employer of providing (to bargaining unit employees) single coverage health insurance as offered to non-bargaining unit employees pursuant to the same eligibility/participation required and employee contributions applicable to those non-bargaining unit employees, but in no event will this "base-line" cost to the Employer of alternate coverage be less than $280 per month for the period commencing 7/1/05, increased by three percent (3%) each succeeding anniversary. The cost to the Fund is defined as the amount of money due the Fund over a previous twelve-

22–

month period as selected by the Employer, or the amount of money projected to be due over a future twelve-month period, as selected by the Employer.

(C)   Calculation of Additional Funding: To determine if sufficient additional money (hereafter "additional available money") is available to pay this additional cost, the following calculations will be made:

(i)   If the System continues to utilize a Medicaid per diem rate, breaking out labor components, the following will apply:

(a)   One rate ("rate 1") will be calculated, utilizing the reimbursement system then in effect to calculate the labor components of the then current rate. A second rate ("rate 2") will be calculated, utilizing the 7/1/01 System (as adjusted for inflation pursuant to the System), as if the System has not been modified since 7/1/01. Rate 2 shall be subtracted from rate 1, the result being "the difference in the per diem rates."

(b)   Future changes in the Medicaid reimbursement system which result in decreases in reimbursement increases to the Employer in non-labor related component areas shall reduce any reimbursement increases in labor related component areas to calculate the then current labor components Medicaid per diem rate.

(c)   The "difference in the per diem rates" derived in paragraph 20(C)(i)(a) above will be multiplied by the number of Medicaid days identified in the then most recently filed Medicaid Cost Report. This product will then be multiplied by a fraction. The numerator of the fraction shall be the total of wages paid and cost of benefits for bargaining unit employees during the first year of the contract (twenty six pay periods). The denominator of the fraction shall be the total wages paid and cost of benefits for labor over the same time period. This product shall be the additional available money.

(d)   If any additional funding is made available outside of the Medicaid per diem rate (e.g., via a "tobacco tax"), which enhances reimbursement to the facility for labor costs, some or all of that funding (as determined in accordance with the formula set forth below in this paragraph 20(C)(i)(d)) will be added to any additional available money derived above (in accordance with paragraph

23–

20(C)(i)(c)) to determine the additional available money to pay for the Employer's contributions to the Fund and possible wage increases under paragraph 20(E) below. The Employer shall utilize such additional funding in accordance with government requirements. If the government fails to designate how this additional funding is to be used, the portion of the funding to be used for this calculation will be determined in accordance with the following formula: the additional funding will be multiplied by a fraction, the numerator of which is the total of wages paid and cost of benefits for bargaining unit employees for the immediately preceding full calendar year, and the denominator of which is the Employer's total expenses for the facility for the same preceding full calendar year. (Note: any changes in the System which result in a decrease in the per diem rate shall offset any additional funding described in this paragraph 20(C)(i)(d).)

Example 20C-1: Assume the labor components Medicaid per diem rate utilizing the reimbursement system in effect on 7/1/01 total $60, the labor components Medicaid per diem rate utilizing the new reimbursement system total $70, the total number of Medicaid days for the year is 50,000, and the total of wages paid and cost of benefits for bargaining unit employees during the first year of the contract represent 50% of total wages paid and cost of benefits for all employees over the same period. The additional money available to the Fund and possible wage increases under paragraph 20(E) will be $250,000 (($10 difference between the rates times 50,000 Medicaid days time 50% of total labor costs).

Example 20C-2: Same assumptions as in Example #1 immediately above. In addition, assume that a tobacco tax generates $100,000 in additional reimbursement to the Employer, and the total of wages paid and cost of benefits for bargaining unit employees for the immediately preceding full calendar year is 25% of the Employer total expenses for the facility for that calendar year. The additional money available to the Fund and possible wage increases under paragraph 20(E) will be $275,000 ($250,000 generated as a result of the increase in the labor components Medicaid per diem rate under Example #1 above, plus $25,000 (25% of the $100,000) generated by

24—

> the tobacco tax for wages paid and cost of benefits for
> bargaining unit employees.

(ii) If a new Medicaid reimbursement system no longer utilizes a
facility specific cost based system or it fails to break out labor
components for the per diem rate, the parties agrees that a
calculation will be used which will achieve the principles
addressed above, i.e., the additional money shall be apportioned
between the total of wages paid and cost of benefits for bargaining
unit employees, on the one hand, and all other expenses to the
facility, on the other hand.

(iii) It is recognized that not every possible change in funding can be
contemplated in this paragraph 20(C) (for example, a provider tax).
In such event, the parties agree that the arbitrator shall utilize the
principles in this paragraph 20(C) to determine if there is sufficient
additional available money to pay the additional Employer
contributions to the Fund for bargaining unit employees and
possible wage increases under paragraphs 20(E) below

(D) Alternate Coverage if Employer Elects to Withdraw from Fund:

(i) The Employer may elect to remain in or withdraw from the Fund,
consistent with the principles set forth above, at annual intervals
beginning 7/1/05. It is contemplated that the applicable effective
dates for this determination shall be 7/1/05 and 7/1/06,
respectively; provided, however, that these dates shall be rolled
ahead (beyond 7/1/05 and 7/1/06, respectively) if the Employer
lacks sufficient information, either regarding the cost of funding
the Employer contributions required for the Fund or the additional
money available to pay for such additional cost of funding such
required Employer contributions to the Fund. In no event shall the
Employer lose its opportunity to make this determination because
of the passage of a specified date unless the Employer has the
information necessary to enable the Employer to make an informed
determination.

(ii) In the event the Employer elects to withdraw from the Fund,
bargaining unit employees may enroll in the same health insurance
plan then available to the Employer's non-bargaining unit
employees pursuant to the same eligibility/participation
requirements and employee contributions applicable to those non-
bargaining employees, but in no event shall the Employer's cost for
this alternate coverage be less than $280 per month for the period

25—

commencing 7/1/05, increased by three percent (3%) each
succeeding anniversary.

(E)     Wage Increases for 4/1/06 and 5/1/07.

(i)     Should the Union and Employer be unable to agree on wage
increases for 4/1/06 and/or 5/1/07, the Employer shall not be
obligated to increase wages greater than 3%, except to the extent
that there is money still available in the additional money after
deducting the additional Employer contributions to the Fund as
defined above.

(ii)    To determine if the Union's proposed wage increase could be
funded after deducting the additional Employer contributions to the
Fund, the Union's proposed percentage wage increase would be
multiplied by the total wages paid for bargaining unit employees in
the then most recent twelve month period (twenty six pay periods).
To this product would be added all employer costs related to the
wage increases which are a function of payroll. These employer
costs would include, but not be limited to, the cost of social
security taxes, workers compensation, unemployment insurance,
Medicare Taxes, and the cost of union welfare, training and
upgrading funds. This total would then be compared to the money
available pursuant to paragraph 20(C) above.

(F)     Grievances and Arbitration. The Union may grieve if:

(i)     The Union believes the Employer's withdrawal from the Fund
violates the provisions of this Agreement; and/or

(ii)    The Employer implements a wage increase on 4/1/06 and/or 5/1/07
which the Union believes fails to reflect the amount of money
available to fund a wage increase beyond three percent (3%).

(iii)   The parties agree to expedite arbitration. The arbitrator shall
utilize the foregoing principles in resolving any such grievances.

## 21. MANAGEMENT RIGHTS

A.      Subject to the provisions of this agreement it is recognized that the
Employer retains the right to exercise the customary functions of management in operating its
home. Such rights shall include but not be limited to location of operations, types of equipment
to be used or materials purchased or sold, and whether or to what extent any service or activities,
of any nature whatsoever shall be added, modified, eliminated, or obtained by contract with any
other employer, and this right includes the right to hire and determine the number of employees

26–

in the nursing home or a department including the number assigned to any particular work, to increase or decrease that number, to direct and assign their work, to establish new job classifications and job content and qualifications and wage rates therefore, to change or combine the job content of any classifications, to determine when and where overtime shall be worked, to establish and schedule the working hours of the employees, to determine the reasonable work pace, work performance levels and standards of performance of the employees, to require safety devices and equipment, to layoff, discipline, discharge for just cause, suspend for just cause, transfer, promote and take any action considered necessary to establish and maintain efficiency and discipline. The Employer shall have the right to maintain discipline and efficiency, and may discharge or suspend any employee for just cause. Just cause for immediate discharge shall include, but not be limited to:

1.  Being under the influence of intoxicants, bringing or using intoxicants or drugs on company time or on company premises.

2.  Sleeping during work hours.

3.  Punching the time card of another employee purposely.

4.  Falsifying records on company forms.

5.  Leaving the work station during working hours without permission.

6.  Theft.

7.  Fighting on company time or on company premises.

8.  Frequent tardiness or unexcused absenteeism.

9.  Deliberate abuse of equipment, material or property.

10.  Insubordination or refusal to accept reasonable orders.

11.  Gambling on company time or on company premises which is in violation of law or is not in the best interest of the company or its employees.

12.  Carelessness endangering safety of self or others.

13.  Failure to give reasonable notification of unexcused absence for three (3) consecutive working days and if illness is prolonged reasonable notification must be given before returning to work.

14.  Failure to satisfactorily account for merchandise or property entrusted to employee.

15.   Physical abuse of residents, visitors or fellow employees.

16.   Verbally or physically assaulting or threatening residents, co-workers, supervisors or visitors.

17.   Unauthorized possession of firearms while on Facility premises (including breaks) or on duty.

B.   1.   The Employer may employ employees of agencies under the circumstances set forth in Article 6C, and such agency employees shall not be covered by the terms of this Agreement.

2.   Except for agency employees, the Employer shall not subcontract bargaining unit work performed at the facility unless the contractor agrees to assume and be bound by this Agreement.

3.   Where a contractor agrees to assume and be bound by this Agreement, the Employer shall not be responsible for the actions of the contractor and shall not have any liability under this Agreement with respect to the contractor's employees.

C.   The Employer may assign bargaining unit work to supervisors and non-bargaining unit employees, so long as such right is not abused.  Volunteers may perform bargaining unit work.

D.   The Employer may assign bargaining unit work to others (e.g., supervisors, non-bargaining unit employees and volunteers) so long as such assignments do not result in the layoff of bargaining unit employees.

## 22. PARTIES

This Agreement shall be binding upon the parties hereto, their successors and assigns.

## 23. TERMS OF EMPLOYMENT

The terms and conditions of employment as set forth in this Agreement shall govern the relations between the Employer and his respective employees, and no deviation from or modification of said terms and conditions of employment shall be permitted.

## 24. DURATION

A.   This Agreement shall become effective from December 26, 2002, and shall remain operative and binding upon the parties hereto, their heirs, successors, assigns, and administrators through September 30, 2007.

28—

B.    The Agreement shall not be changed, altered, modified or amended, unless in writing, and signed by the authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year above written.

SEIU 1199 NEW JERSEY

BY _____
    AUTHORIZED SIGNATURE

WANAQUE OPERATING CO., L.P.

BY _____
    AUTHORIZED SIGNATURE

## SCHEDULE A

### NEW HIRE WAGE RATES (FOLLOWING PROBATIONARY PERIOD)

Employer shall increase the post-probation new hire wage rates for employees in the below classifications on or before the effective dates set forth below:

(a)    Certified Nursing Assistants:

|  | Effective Ratification | Effective 3/1/05 | Effective 5/1/07 |
|---|---|---|---|
| Probation Rate | $9.00 | $9.50 | $10.00 |
| Post-Probation Rate | $9.25 | $9.75 | $10.25 |

(b)    Nursing Assistants:

|  | Effective Ratification | Effective 3/1/05 | Effective 5/1/07 |
|---|---|---|---|
| Probation Rate | $7.75 | $8.25 | $8.75 |
| Post-Probation Rate | $8.00 | $8.50 | $9.00 |

(b)    Dietary, Housekeeping and Laundry Employees:

|  | Effective Ratification | Effective 1/1/03 | Effective 7/1/03 |
|---|---|---|---|
| Probation Rate | $6.65 | $6.80 | $6.95 |
| Post-Probation Rate | $6.90 | $7.05 | $7.20 |

|  | Effective 3/1/05 | Effective 5/1/07 |
|---|---|---|
| Probation Rate | $7.45 | $7.95 |
| Post-Probation Rate | $7.70 | $8.20 |

30--

Notes:    (1)    All increases in minimum wage rates shall commence with the first full pay period after the dates listed above.

(2)    Upon advance notification to the Union, the Employer may, at its discretion, increase the probation rate and post-probation minimum for employees on a per job classification basis without increasing rates for incumbents in that classification so long as any current post-probationary employee in that classification receiving less than the contractual post-probation minimum is brought to the new contractual post-probation minimum, and any current probationary employee in that classification is brought up to the new contractual probation rate. The Union may request discussion provided that such discussion occurs within three (3) business days of receipt of notice by the Union.

(3)    In the event a wage adjustment is advanced pursuant to paragraph (B) of WAGE INCREASES, below, the probation rate and post-probation rate for the affected classification need not be advanced until the date the normally scheduled wage adjustment would have been due.

## WAGE INCREASES

(A)    Non-probationary employees shall receive hourly increases listed below, commencing with the first full pay period after the dates listed below, or the probation rate(s) and post-probation minimum(s) that may be put into effect on those dates, whichever results in a higher rate for that employee:

| Effective Date | Hourly Increase |
|---|---|
| 1/1/03 | 3% |
| 2/1/04 | 3% |
| 3/1/05 | 3.5% |
| 4/1/06 | 3% (Subject to paragraph 20, above.) |
| 5/1/07 | 3% (Subject to paragraph 20, above.) |

(B)    Wage Increase Advance:

Upon advance notification to the Union, the Employer may (but is not required to) in its discretion advance all or part of the wage increases at different times for different job classifications so long as it does so on an across the board basis for such affected classification(s). The Union may

31—

request discussion provided that such discussion occurs within three (3) business days of receipt of notice by the Union.

Should all of the above increases over the life of the Agreement be advanced to a particular job classification, the Employer may (but is not required to) in its discretion implement increases of up to 3% in yearly intervals starting twelve (12) months from the effective date of the last advance wage increased to the affected job classification.

In the event the Employer advances any wage increase and an employee is hired after the advance of such increase, the employee shall receive the wage adjustment which was otherwise provided for which is or becomes due on or after the employee's probationary period or the minimum post probation rate for the classification, whichever is greater.

SEIU 1199 NEW JERSEY

By: _____ 8/3/03
AUTHORIZED SIGNATURE

WANAQUE OPERATING CO., L.P.

By: _____
AUTHORIZED SIGNATURE